No. 2992.

JOHN ANDREW JOHNSON v. THE STATE.

1. PRACTICE—CHANGE OF VENUE was applied for upon the ground that
the accused could not secure a fair trial by an impartial jury because
of the prejudice prevailing against him throughout the county. The
proof shows that whatever prejudice existed against the accused was
confined to a single section of the county, and it is made to appear
that none of the jurors who tried the case resided in that section of the
county. *Held*, that the refusal of the trial court to change the venue
was not error.
2. RAPE—FACT CASE.—See the statement of the case for evidence *held*
sufficient to support a capital conviction for rape.

APPEAL from the District Court of Houston. Tried below be-
fore the Hon. F. A. Williams.

The death penalty was assessed against the appellant for the
rape of Miss Ollie Sims, in Houston county, Texas, on the first
day of July, 1888.

Miss Ollie Sims was the first witness for the State. She tes-
tified that she lived at the house of her father, and at the time
of this trial was seventeen years old. On the thirteenth day of
June, 1888, she started to the field near her father's house, lead-
ing her pony, her purpose being to stake him on the grass. At
a point between the house and the place in the field where she
designed staking her pony, the animal stopped to nibble grass.
Witness looked back and saw a negro boy advancing rapidly
toward her. She stopped and the boy came up and asked her
for directions to Mr. Bird's house. When the witness turned
to point him to the road, the boy seized her around the body,
pressing her arms closely to her sides. He then threw the wit-
ness down, pulled up her clothes, got on top of her, and by
main strength and force, despite her protests, screams and
struggles, had carnal knowledge of her person, penetrating her
sexual organ with his male member, first having inserted his
finger. Although the witness had never seen the negro before,
and had never seen him since until this trial, she was absolutely
certain that the defendant was that negro. He had on a dirty
white shirt and no coat at the time of the outrage, and when

he overtook the witness he had his small red hat in his hand. He wore it off on his head, and went toward Mr. Bird's house. The defendant so held the witness during the perpetration of the outrage that she could not escape. She screamed and resisted with all of her power. Defendant told her that if she did not hush he would choke her to death. Upon being released the witness fled toward her home, calling her sister as she ran. Her sister met her near the house, and witness at once told her what had happened. As a result of the outrage perpetrated upon her, the private parts of the witness were very much lacerated, and confined her to the house for some time. Witness did not consent to the carnal act, but resisted as long as she was able. She did not see Coke Gunnels plowing near the scene of the outrage at the time it occurred.

Miss Dovie Sims, sister of the prosecutrix, testified, for the State, that she was at home when her sister Ollie, on the thirteenth day of June, 1888, took her pony to stake him out in the field. Soon after she left the witness heard her scream as if she was in distress, and a short while later saw her coming toward the house, calling to her, witness. Witness ran to meet her said sister, whose clothing was bloody, who was still bleeding and who could scarcely walk. Ollie told witness what had been done to her as soon as she met her.

M. S. Sims, the father of the prosecutrix, testified, for the State, that he was at work in his field, half a mile distant from the scene of the outrage, at the time it occurred, but was apprised of it a few minutes later. He went at once to the place indicated by his daughter and saw unmistakable signs of a recent struggle on the ground, and in the growth of oats. From that point the witness traced the perpetrator of the outrage by his tracks to the place where Coke Gunnels was working. He saw and talked to the said Coke Gunnels. Witness's daughter was sick for some time as a result of the outrage committed upon her, and was professionally treated by Doctor S. T. Beasley.

— Sims, the brother of the prosecutrix, testified, for the State, that he lived in a house near that of his father. He was at work on his father's place at the time the outrage occurred. The witness made diligent search for the defendant on the evening and night after the outrage, but failed to find him. He was arrested next day near Crockett. Defendant, at the time of the outrage, lived about three-quarters of a mile distant from the house of the witness's father.

Coke Gunnels, colored, testified, for the State, that, at the time the outrage occurred, he was at work, plowing in the field of Mr. Bird, which adjoined that of Mr. Sims. Just before the outrage was committed he saw Miss Ollie Sims leading her pony in her father's field. He then observed the defendant following her. Defendant soon overtook and seized her, and then threw her down. Witness then heard Miss Ollie scream and call for "Buddie" to "come and make this boy let me alone." He also heard Miss Ollie tell defendant to "quit," and that he was hurting her. After a while the defendant got up, and Miss Ollie fled towards her father's house, calling for her sister. Defendant then came to where the witness was, which was towards Mr. Bird's house from the place where he had thrown Miss Ollie down, and asked witness: "Did you see what I done to that girl?" Witness replied that he did, when defendant said: "I came very near f——g her to death." Defendant then asked witness not to tell anybody what he had done, and left. Defendant was wearing a red hat and a dirty white shirt. He had on no coat. Witness knew defendant well, and knew that he was the person who committed the outrage on Miss Ollie Sims.

Cross examined, the witness said that he observed the transaction from a distance of about seventy-five yards. Soon after the commission of the outrage, Mr. Sims, the father of Miss Ollie, came to the witness in Bird's field, and asked him if he had seen anything of a negro passing from one field into the other, and who such negro was. Witness told him that he had seen the defendant. He said nothing to Sims about the outrage, because he supposed that he had already been told of it by his family. Witness went to Mr. Bird's house soon after the outrage, and at once told Mr. Bird about it. He went to the house purposely to tell Bird what he had seen done by defendant.

Doctor S. T. Beasley testified, for the State, that he was called to visit Miss Ollie Sims professionally soon after the rape was alleged to have been committed. He found her sick with flux and became satisfied that she was also suffering from other causes. Miss Sims was finally prevailed upon to submit to an examination, the result of which was to disclose that her female organ was badly lacerated and torn by recent violence. Her said organ presented every appearance of recent sexual connection with the male organ, and appeared to have been bruised

and hurt by a finger, or other rough instrument. The lining of the vagina indicated very rough recent treatment. Her female organ was unusually small for a female of her age.

Cross examined, the witness stated that, on the day after the alleged rape, he made an examination of the defendant's sexual organ, and found it to be one of extraordinary large size for a male of his size and age. He discovered no blood nor trace of swelling on the defendant's penis, which, however, would not retain evidence of violent exercise, for so long a time as had then elapsed since the rape. His clothes showed no traces of blood, or other evidence of recent copulation. Miss Sims was very weak when the witness saw and examined her, and it was his opinion that she was suffering from a bowel complaint at the time of the rape.

Deputy Sheriff Ike Daniel testified, for the State, that he heard of the rape of Miss Sims on the day that it occurred, and at once started in pursuit of the defendant. He went first to Bird's house, where the defendant lived, but did not find him. He did find his small red hat at that place. Defendant was arrested on the next day about four miles distant from the scene of the rape.

The State closed.

William Johnson, the father of the defendant, testified that the defendant was born on Mr. J. T. Bird's place in the year 1873. On cross examination the witness said that he was married in 1867. His oldest child, Joe, was born in June, 1868. The next child was born about fifteen months later, and the defendant, who was the witness's third child, was born about eleven months later. Witness could neither read nor write. He did not know what year the war between the States closed. He was a slave up to that time, and kept no count of time. He had a record of the births of his children, written on a piece of paper. His son-in-law wrote that record down about eight years ago.

Laura Johnson, the half sister of the defendant, testified in his behalf, that she knew that defendant was born on Mr. Bird's place, but she could not now name the year.

The defense closed.

H. C. Leaverton, M. M. Baker and M. K. Murchison were called by the State in rebuttal. The former testified that the defendant was born in the year 1869, a few months before the marriage of witness. The two last named witnesses testified

that they first knew the defendant in 1873, when he was a boy four or five years of age, and large enough and old enough to drive an ox team under the direction of his brother Joe.

William Johnson was recalled by the State and asked if he did not, at a certain time and place, ask one Archie Baker how old he, said Baker, was, and give as a reason that the defendant was born in the June following the May of said Baker's birth. The witness denied that he asked such question of or made such statement to Baker. He was then asked if, two years prior to this trial, he did not try to hire the defendant to one L. W. Cooper, and at that time tell the said L. W. Cooper that the defendant was then seventeen years old. Witness denied that he ever attempted to hire defendant to Cooper, or made such statement concerning the defendant's age.

Baker and Cooper were then placed upon the stand, in rebuttal, and the former testified that, in May, 1887, when he was seventeen years old, the defendant's father, William Johnson, asked him his age, and stated that he wanted to know in order to correctly fix the age of the defendant, who was born in June of the year in which witness was born in May. Cooper testified that, two years before this trial, William Johnson offered to hire the defendant to him, and then told him that defendant was seventeen years old.

The State closing finally, J. F. Bird testified, for the defense, that the defendant's father moved to his place either in 1871 or 1872—he did not recollect which. The defendant was then about one year old.

No brief for the appellant has reached the Reporters.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. We perceive no error in the action of the court refusing to change the venue of this cause. There is nothing in the record which raises even a suspicion that the defendant was deprived of a fair trial by an impartial jury. Whatever prejudice there may have been against the defendant was shown to have been confined to persons who resided in a particular portion of the county, and none of the jurors who tried the cause resided in that portion of the county. In all respects, the trial judge conducted the trial with scrupulous

regard for the rights of the defendant, and the record fails to disclose a single error, or even an irregularity.

That the conviction is warranted by the evidence there is no doubt. The proof of the defendan.. guilt is conclusive, and the deliberate, brutal manner in which the crime was perpetrated justified the jury in assessing the death penalty.

The judgment is affirmed.

*Affirmed.*

Opinion delivered November 15, 1888.